STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

SHARON BOXIE

VERSUS

DR. DWIGHT LEMOINE, ET AL.

************

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT,
PARISH OF CALCASIEU, NO. 2003-4045
HONORABLE WILFORD D. CARTER, DISTRICT JUDGE

************

**JIMMIE C. PETERS**
**JUDGE**

************

Court composed of Jimmie C. Peters, Elizabeth A. Pickett and Billy H. Ezell, Judges.

**AFFIRMED.**

**John L. Hammons**
**Nelson & Hammons**
**705 Milam Street**
**Shreveport, LA 71101**
**(318) 227-2401**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
       **Sharon Boxie**

**James R. Shelton**
**Durio, McGoffin, Stagg & Ackermann**
**Post Office Box 51308**
**Lafayette, LA 70505**
**(337) 233-0300**
**COUNSEL FOR DEFENDANTS/APPELLANTS:**
       **Dr. Dwight Lemoine, St. Paul Fire & Marine Insurance Company, and the**
       **Louisiana Patient's Compensation Fund.**

PETERS, J.

The defendants in this medical malpractice suit, Dr. Dwight R. Lemoine, St. Paul Fire & Marine Insurance Company (St. Paul), and the Louisiana Patient's Compensation Fund (PCF), appeal the trial court's grant of a judgment notwithstanding the verdict awarding Sharon Boxie general and special damages for injuries she sustained as a result of a surgical procedure performed May 8, 2000. Ms. Boxie responded to the appeal by filing a peremptory exception of no right of action addressing the right of the PCF to participate in the appeal. For the following reasons, we reject the exception of no right of action, affirm the trial court's judgment notwithstanding the verdict, and affirm the trial court's damage awards.

In early 2000, Dr. William Foster, a Lake Charles, Louisiana neurosurgeon, was treating Sharon Boxie for pain arising from disc protrusions in the cervical region of her spine. On May 8, 2000, in an effort to relieve Ms. Boxie's pain from the disc protrusions, Dr. Foster performed surgery on her neck.[1] Ms. Boxie checked into a Lake Charles hospital at approximately 8:00 a.m. on that morning, and, after admission and pre-operation procedures were completed, surgery began at approximately 10:15 a.m. Dr. Lemoine participated in the surgery as the anesthesiologist with the assistance of his nurse-anesthetist, John Scott.[2] The surgical procedure rendered Ms. Boxie a quadriplegic, and the litigation now before us involves her medical malpractice claim against Dr. Lemoine.

After a medical review panel empaneled pursuant to La.R.S. 40:1299.47 rejected her claim against Dr. Lemoine, Ms. Boxie instituted suit against the doctor

---

[1]The actual procedure was described as a cervical hemilaminotomy and foraminotomy at C3-4 and C4-5.

[2]Dr. Lemoine has admitted that Mr. Scott was operating under his supervision, and that he is responsible for Mr. Scott's actions and inactions. Although Mr. Scott is not a defendant, any negligence on his part is considered the fault of Dr. Lemoine. Thus, when referring to Dr. Lemoine's fault herein, such referral includes reference to Mr. Scott's actions.

and his liability insurer, St. Paul. A five-day trial in November of 2006 resulted in a jury verdict which concluded that neither Dr. Lemoine nor Mr. Scott violated the standard of care applicable to them, i.e., that neither man was at fault in causing Ms. Boxie's injuries. On November 30, 2006, the trial court executed a judgment dismissing Ms. Boxie's suit against Dr. Lemoine.[3]

In response to this judgment, Ms. Boxie filed a motion seeking a judgment notwithstanding the verdict (JNOV) or, in the alternative, a new trial. After a January 22, 2007 hearing, the trial court granted the JNOV.[4] In doing so, the trial court assessed Dr. Lemoine with sixty percent of the fault in causing Ms. Boxie's damages and assessed Dr. Foster with the remaining forty percent. With regard to damages, the trial court awarded Ms. Boxie the following amounts: $700,000.00 for past medical expenses; $2,300,000.00 for future medical expenses and related care; $1,000,000.00 for lost wages; and $1,000,000.00 for pain and suffering. Based on its assessment of fault, the trial court then reduced the award for general damages and lost wages to $500,000.00 pursuant to La.R.S. 40:1299.42 *et seq.* Thus, the final judgment executed by the trial court on February 21, 2007, awarded Ms. Boxie $500,000.00 for general damages and lost wages; $700,000.00 for medical expenses sustained between May 8, 2000, and November 13, 2006; and a continuing care award pursuant to La.R.S. 40:1299.43. The judgment also limited the liability of Dr. Lemoine and St. Paul to $100,000.00, pursuant to La.R.S. 40:1299.42, and assessed the balance of the judgment to the PCF.

---

[3]The judgment does not mention St. Paul Fire & Marine Insurance Company.

[4]The trial court also granted, as alternative relief, the motion for new trial. However, the grant of that motion was conditioned on the action of the reviewing court. That is to say, in the event a reviewing court reversed the grant of the JNOV, the trial court granted the new trial.

Dr. Lemoine, St. Paul, and the PCF appealed, asserting four assignments of error:

1.  The trial Court erroneously granted the JNOV Motion because it created its own standard of care by requiring Dr. Lemoine to listen to the patient's carotid arteries with a stethoscope when there was absolutely no evidence to support the Court's finding.

2.  The trial Court erroneously granted the Motion for a New Trial as the verdict was not contrary to the law and evidence because there was expert testimony that supported Dr. Lemoine's management of the case.

3.  The award of $5,000,000.00 in damages is excessive, especially the award of $700,000.00 in past medical expenses which represented medical expenses incurred between May 8, 2000 and the date of trial because a significant number of those bills were not authenticated and were not connected to the treatment the patient received as a result of her stroke.

4.  The trial Court erred in giving a jury instruction regarding *resa ipsa loquitur*.

### *Exception of No Right of Action*

Before considering the merits of the appeal, we must first address the peremptory exception of no right of action filed by Ms. Boxie. The defendants filed their motion for suspensive appeal on March 12, 2007, and the trial court granted the motion by written order on March 21, 2007. This exception is based on the fact that the PCF has not sought recognition as a party to the litigation by filing a petition to intervene.[5] That being the case, Ms. Boxie asserts that, pursuant to La.Code Civ.P. art. 927(A)(5), the PCF has no right to participate in this appeal.

An intervention is an incidental demand. La.Code Civ.P. art. 1031(B). As such, it "shall be commenced by a petition which shall comply with the requirements

---

[5]The record reflects that Dr. Lemoine, St. Paul, and the PCF filed their motion for suspensive appeal on March 12, 2007, and that the trial court granted the motion on March 21, 2007. On May 2, 2007, the PCF filed an answer in the trial court to the original petition although it was not named as a party defendant in the petition. At no time has the PCF sought to intervene in the proceedings.

3

of Articles 891, 892 and 893." La.Code Civ.P. art. 1032. It may be filed without leave of court before an answer to the principal demand is filed, but leave of court is required thereafter. La.Code Civ.P. art. 1033. With regard to the right to intervene by a party of interest, La.Code Civ.P. art 1091 provides:

> A third person having an interest therein may intervene in a pending action to enforce a right related to or connected with the object of the pending action against one or more of the parties thereto by:

> (1) Joining with plaintiff in demanding the same or similar relief against the defendant;

> (2) Uniting with defendant in resisting the plaintiff's demand; or

> (3) Opposing both plaintiff and defendant.

Unquestionably, the PCF is a third party having an interest in the litigation and could have sought to intervene during the trial court proceedings. By intervening, it could have united with the defendants in resisting Ms. Boxie's demands and could have submitted evidence at trial in support of its position. *See Bennett v. Krupkin*, 01-209 (La. 10/16/01), 798 So.2d 940. Had it done so, it would have become a party to the litigation through that intervention. However, nothing requires the PCF to intervene at the trial level. In fact, the PCF is before this court as one against whom a judgment has been rendered and not as one who seeks intervention in a suit.

Despite not participating in the trial level litigation, PCF is statutorily liable for all damages above $100,000.00. La.R.S. 40:1299.42(B)(3)(a); La.R.S. 40:1299.43. We do not find that the statutory law or jurisprudence requires that the PCF file an intervention to be properly before the court in a situation where it has been cast in judgment by operation of law.

A different panel of this court previously addressed this issue and reached the same result, although the issue was presented in a different procedural context. *See*

4

*Boxie v. Lemoine*, 07-905 (La.App. 3 Cir. 10/10/07), 967 So.2d 603, *writ denied*, 07-2168 (La. 1/7/08), 973 So.2d 723. The prior ruling arose because, on August 24, 2007, Ms. Boxie filed a motion with this court to dismiss the appeal, but only insofar as it related to the PCF. In rejecting the motion, this court stated the following:

> We disagree with Appellee's argument that the PCF needed to file an intervention as a prerequisite to being included in the motion for suspensive appeal filed on March 12, 2007. Because the judgment against Dr. Lemoine exceeded one hundred thousand dollars, the PCF became an interested party in this case. *See Felix v. St. Paul Fire and Marine Ins. Co.*, 477 So.2d 676 (La.1985). As an interested party, the PCF had a right to appeal, regardless of whether it filed a petition of intervention. Therefore, we find that the motion for suspensive appeal filed on behalf of the PCF was not premature, even though it was filed before the PCF filed its petition of intervention.

*Id.* at 605.

For the reasons set forth above, we find no ground to change the prior ruling of this court on this issue. Thus, we reject Ms. Boxie's exception of no right of action.

### *Assignment of Error Number One*

In a medical malpractice action, the plaintiff's burden is to prove by a preponderance of the evidence the three elements set forth in La.R.S. 9:2794(A):

> (1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians ... licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians ... within the involved medical specialty.

> (2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.

5

(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.

Thus, to establish Dr. Lemoine's liability to Ms. Boxie for her current physical condition, Ms. Boxie was required to establish (1) the standard of care applicable to Dr. Lemoine in his practice as an anesthesiologist, (2) that Dr. Lemoine breached that standard of care, and (3) that his breach was the proximate cause of her injuries.

The supreme court has set out the criteria for the reviewing court's evaluation of the trial court's grant or rejection of a JNOV in *Joseph v. Broussard Rice Mill, Inc.*, 00-628, p. 4-5, (La. 10/30/00), 772 So.2d 94, 99.

LA.CODE CIV. PROC. art. 1811 controls the use of JNOV. Although the article does not specify the grounds on which a trial judge may grant a JNOV, in *Scott v. Hospital Serv. Dist. No. 1*, 496 So.2d 270 (La.1986), we set forth the criteria used in determining when a JNOV is proper. As enunciated in *Scott*, a JNOV is warranted when the facts and inferences point so strongly and overwhelmingly in favor of one party that the trial court believes that reasonable persons could not arrive at a contrary verdict. The motion should be granted only when the evidence points so strongly in favor of the moving party that reasonable persons could not reach different conclusions, not merely when there is a preponderance of evidence for the mover. The motion should be denied if there is evidence opposed to the motion which is of such quality and weight that reasonable persons in the exercise of impartial judgment might reach different conclusions. *Scott*, 496 So.2d at 274. In making this determination, the trial court should not evaluate the credibility of the witnesses, and all reasonable inferences or factual questions should be resolved in favor of the non-moving party. *Anderson v. New Orleans Pub. Serv., Inc.*, 583 So.2d 829, 832 (La.1991). This rigorous standard is based upon the principle that "[w]hen there is a jury, the jury is the trier of fact." *Scott*, 496 So.2d at 273; *Jinks v. Wright*, 520 So.2d 792, 794 (La.App. 3 Cir. 1987).

In reviewing a trial court's decision on whether or not to grant a JNOV, the appellate court must determine if the trial court erred in granting or denying the JNOV "by using the aforementioned criteria just as the trial judge does in deciding whether to grant the motion or not, i.e. do the facts and inferences point so strongly

and overwhelmingly in favor of the moving party that reasonable persons could not arrive at a contrary verdict?" *Id.* at 99. If the answer to that question is in the affirmative, then the motion should have been granted. If not, it should be rejected. *Id.*

Much of the evidence concerning what occurred before, during, and after Ms. Boxie's surgery is not in dispute, and was provided by Dr. Foster, Dr. Lemoine, and Mr. Scott—the three men who were present during the entire procedure. Other testimony addressing the malpractice issue was provided by Dr. Brian Loftus, a Houston, Texas neurologist; Dr. Brett David Wolff, a board certified anesthesiologist and internal medicine physician from St. Louis, Missouri; and Dr. Timothy David Faul, a Lafayette, Louisiana anesthesiologist who served as one of the physicians on the medical review panel which first considered this matter.

Ms. Boxie's hospitalization on the morning of May 8, 2000, was supposed to be a relatively routine surgical procedure that was to begin around 8:00 a.m. and end around 2:00 p.m. The events that occurred during that time occurred in three stages: the pre-operative assessment; the surgery; and the recovery stage. The trial itself included a vast amount of testimony presented by both sides concerning purported medical mistakes by Dr. Lemoine in both the pre-operative and post-operative stages. Ms. Boxie did not complain of the jury's rejection of these issues in her JNOV, nor has she complained of these findings on appeal. Thus, the dispute at the JNOV hearing as well as on appeal involves the surgery phase.

The evidentiary record establishes that Ms. Boxie arrived awake and alert in the operating room at approximately 10:15 a.m. Dr. Lemoine, with the assistance of Mr. Scott, attached various monitors to Ms. Boxie, included an esophageal

stethoscope to measure her breath and heart sounds, as well as her temperature; an instrument to monitor her blood pressure; an EKG to monitor her heart rate and rhythm; a pulse oximeter to measure the saturation of the oxygen in her blood; and an instrument to measure the amount of carbon dioxide exhaled by Ms. Boxie during surgery.[6] Dr. Lemoine then placed a jugular catheter in the right side of Ms. Boxie's neck. After attaching these monitors and the catheter, Mr. Scott placed an oxygen mask on Ms. Boxie's face and began administering oxygen to her. She was then administered the anesthesia, and a breathing tube was inserted into her throat and fixed in place.

When Dr. Lemoine and Mr. Scott completed their initial work, Dr. Foster and his surgical nurse placed Ms. Boxie on the operating table in a seated position with her head flexed toward her chest. They then taped her head to a horse-shoe shaped headrest to prevent movement during the surgery. After positioning Ms. Boxie and taping her head in place, Dr. Foster left the operating room to prepare for the surgery. During his absence, Mr. Scott padded various pressure points to preclude compromising nerve conduction. This included elbows, ankles, and similar points of concern. Mr. Scott testified that he padded "anything that looks like it would be compromised to [sic] normal circulation or physiology." However, no areas near the head or neck were padded. During Dr. Foster's absence, the surgical team draped Ms. Boxie with sheets to preserve a sterile area for the surgery. When Dr. Foster returned to the operating room, he immediately began the surgical procedure.

---

[6]These monitors were being attached during the time Ms. Boxie was being transferred from the gurney onto the operating table. In fact, Dr. Lemoine had inserted an IV before Ms. Boxie left the pre-surgery holding area.

From the time they were attached until their ultimate removal when Ms. Boxie was transferred to the recovery room at 1:05 p.m., the monitors recorded vital sign readings within normal ranges.[7] Thus, on the surface, the surgery appeared to be uneventful. However, this appearance proved to be false. Approximately twenty minutes after Mr. Scott handed the care of Ms. Boxie to the recovery room staff, she began to exhibit physical signs that suggested serious medical problems. She lapsed into a coma, and when she emerged from that coma she was only able to move one finger and to slightly move her right foot. Noone disputes the fact that her quadriplegic condition is permanent.

Ms. Boxie was subsequently transferred to Diagnostic Hospital in Houston, Texas, where she came under the care of Dr. Loftus, who became her primary treating physician thereafter. After examining Ms. Boxie and conducting MRI and radiographic studies of the blood vessels of the brain, Dr. Loftus found that her brain stem function was intact,[8] but that the cortices on both sides of her brain had been damaged. Based on his findings, Dr. Loftus concluded that Ms. Boxie had suffered simultaneous bilateral strokes caused by pressure on the carotid arteries on both sides of her neck during the surgery. This conclusion is not disputed by any physician testifying in this matter.[9]

The reason the carotid arteries became mechanically obstructed is also not in dispute. All of the physicians who testified agreed that the obstruction resulted from

---

[7]Mr. Scott testified that he took readings from the monitors every five minutes.

[8]Dr. Loftus based this conclusion on the fact that Ms. Boxie was able to breath normally and her eye movements were full.

[9]At the time Ms. Boxie left the Lake Charles medical facility for transfer to Houston, neither Dr. Lemoine nor Dr. Foster had an opinion concerning the cause of her condition, although they knew from radiological studies performed in Lake Charles that she had suffered bilateral strokes. Both later accepted the findings of Dr. Loftus.

9

Ms. Boxie's chin coming to rest too low on her sternum, either during the positioning process or sometime during the surgery. This position placed constant pressure on the carotids during the surgical procedure, and the consequent deprivation of oxygen to Ms. Boxie's brain caused her bilateral strokes and resultant quadriplegia.[10] Given all of the uniform and undisputed medical testimony, we conclude that no reasonable person exercising impartial judgment could reach any other conclusion.

All of the testifying physicians also agreed that the person or persons responsible for positioning Ms. Boxie, and for maintaining the proper position, are responsible for her injuries. They also all agree that the initial responsibility for properly positioning the patient rests with the surgeon—in this case, Dr. Foster. Thus, the first issue to be resolved is whether Dr. Lemoine had any legal obligation to monitor Ms. Boxie's positioning before and during surgery.

Although, in their testimony, Dr. Lemoine, Dr. Faul, and Mr. Scott attempted to place the sole responsibility for positioning on Dr. Foster, all three witnesses also testified that coordination between the anesthesiology team and the surgical team is essential, and that positioning is a team effort. Specifically, the three men all agreed that the anesthesiologist or his assistant has an obligation to inspect the patient to satisfy himself that the head is not in a position that will cause problems. They agreed that this obligation begins with the initial placement by the surgeon, and extends during the surgery. If, at any time, their inspection reveals an improper positioning situation, their obligation is to inform the surgeon of the problem so that

---

[10]Dr. Lemoine couched his acceptance of this theory by stating that "[o]ther than what's been presented here about the possible positioning and the pressure on the carotids I don't know for sure what caused her stroke[s]." Dr. Faul initially speculated that Ms. Boxie "could have had some anatomical variation in her carotid artery that predisposed her to a low blood flow state by a certain positioning of her head which she did not report pre-operatively," but acknowledged later is his testimony that there is no evidence to support that speculation.

it might be corrected. Mr. Scott testified that it was his job to visually monitor head movement before and during surgery, and to take immediate and appropriate action if any was observed. Dr. Faul testified that "[as] anesthesiologist[s], and physicians, we do our best to position a patient in what appears to be a comfortable, neutral position for the patient."

Dr. Lemoine also acknowledged that one of his obligations is to check the positioning of the patient's head once it was taped in place to insure that nothing causes undue pressure to the facial or cranial nerves or blocks the airway. He also testified that the sitting position has declined in use because it "is a more risky position" than lying flat and one must take more care to make sure the patient is in proper position. Still, he declared the position could be used safely if everyone did his job.

Dr. Wolff was more specific in explaining the anesthesiologist's obligation with regard to the positioning of a patient's head. He explained that the carotid arteries pump blood at high pressure to the brain and that the importance of these arteries, together with the fact that the flow through them is not registered by the attached monitors, mandates that the anesthesiologist and the nurse anesthetist administering anesthesia in this type of surgery monitor the positioning of the head and neck both at the beginning and through the surgery to prevent the very pressure on the carotids that caused Ms. Boxie's strokes.[11] According to Dr. Wolff, the anesthesiologist must make sure that the position of the patient's head maintains a forty-five degree flexion between the chin and the sternum. He suggested that a

---

[11]Dr. Wolff explained that the fact that Ms. Boxie was obese made the monitoring process all the more important. The soft tissue in the neck of an obese person can be compressive, and proper positioning is critical to prevent arterial and venous compression.

simple test for making sure the carotid arteries are not mechanically obstructed by the positioning of the head is to place two fingers between the patient's chin and sternum. If there is less than two fingers of clearance compression may occur.

Given all of the uniform and undisputed medical testimony, we conclude that no reasonable person exercising impartial judgment could conclude anything other than that the standard of care applicable to an anesthesiologist includes the duty to monitor the positioning of a patient's head both before and during surgery. Having reached that conclusion, we next consider whether Dr. Lemoine breached that duty in his treatment of Ms. Boxie.

In their first assignment of error, the defendants limit their argument to the assertion that the trial court created a nonexistent standard of care in that it found Dr. Lemoine at fault for failing "to listen to [Ms. Boxie's] carotid arteries with a stethoscope" during the surgical procedure. While we agree that the record contains no evidence to establish the use of a stethoscope as being within the standard of care required of Dr. Lemoine, we find no merit in this assignment of error as stated, because we find no reference in the trial court's reasons for judgment to the use of a stethoscope.[12] Instead, the trial court stated that "it is undisputed that the cause of the injury to Ms. Boxie was the mechanical obstruction of blood flow to the carotid artery to the brain" over a period of time rather than an abrupt blockage, and that the partial obstruction would not manifest itself on the blood pressure monitors in place during the surgery. As previously stated, these assertions of fact were agreed to by all of the expert witnesses who testified.

---

[12]Both Dr. Wolff and Dr. Faul agreed that the use of a stethoscope was not required as a part of the standard of care required of an anesthesiologist, although Dr. Wolff testified that it would have been beneficial in this particular case.

With regard to monitoring the carotid arteries, the trial court noted that both Dr. Lemoine and Mr. Scott acknowledged a responsibility to check pressure points during the course of the surgery to avoid permanent nerve damage, and concluded that "the carotid artery is a pressure point that should be monitored." Based on this conclusion, the trial court further concluded that the failure by Dr. Lemoine and/or Mr. Scott to monitor that pressure point "amounts to negligence that caused the injury suffered by [Ms. Boxie]."

The trial court also concluded that Dr. Foster's initial placement of Ms. Boxie in the position for surgery "more than likely was a substandard act on" his part, but that the placement "was subject to the approval" of Dr. Lemoine; that Dr. Lemoine had a continued obligation to monitor and approve placement; and that he "at any time could have corrected this placement." In reaching these conclusions, the trial court found "dual substandard responsibility" between Dr. Foster and Dr. Lemoine with regard to the placement issue.

The only statement of the trial court not necessarily supported by the record is that Dr. Foster's initial placement of Ms. Boxie was substandard. Dr. Foster, Dr. Lemoine, and Mr. Scott all testified that they found nothing wrong with the initial positioning. To reach the conclusion it did with regard to the initial positioning, the trial court had to conclude that this testimony was not credible. That credibility determination cannot be a part of the decision to grant or reject a motion for a JNOV. *Joseph*, 772 So.2d at 99. However, it matters not whether the positioning was initially improper or became improper during the surgery, as the result is the same.

Following the holding in *Joseph*, we accept as accurate the testimony that the initial positioning was proper. That being the case, the evidence demonstrates

13

conclusively that sometime after the beginning of the surgery, Ms. Boxie's head moved a sufficient distance to cause the mechanical obstruction of her carotid arteries—a movement missed by Dr. Foster, Dr. Lemoine, and Mr. Scott. The evidence also demonstrates conclusively that the only way to be assured that a patient's head remains in the correct position during surgery is by visual inspection.

Mr. Scott's explanation for not leaving his seated position to lift the drapes and check the physical position of Ms. Boxie's head was that he did not consider it necessary because the monitors continued to give acceptable readings and because he observed no movement of Ms. Boxie's head.[13]  However, both Dr. Lemoine and Mr. Scott testified that they were aware that the attached monitors would give no warning of difficulties with the carotid arteries.

The idea is vaguely suggested in some of the testimony that the anesthesiologist or the nurse anesthetist is expected to lift the drapes to visually inspect the head position only when a problem appears while the surgical procedure is in progress. This is circular reasoning that flies in the face of common sense. It requires us to believe that the anesthesiologist does not need to take action to prevent a problem until he learns that the problem already exists. The lesson we learn from this circular reasoning is brought home by the facts of this case: it was not until after Ms. Boxie was extubated and in the recovery room that her nurses reported that something was terribly wrong. Thus, inspection after the fact would have been of no use because the strokes had already occurred and she had already suffered permanent damage.

---

[13]We note that the record contains testimony that a sudden head movement would have been apparent to a person watching Ms. Boxie's head. However, there exists no testimony concerning the ease of discovery of a gradual or seemingly insignificant change in position. Dr. Wolff testified that even slight slippage could reduce the spacing between the chin and the sternum to a dangerous angle.

Mr. Scott's testimony that he did not see Ms. Boxie's head move during the two and one-half hour procedure does not establish that it did not move. To the contrary, all of the physical evidence establishes that her head did move and he missed the movement, apparently while checking his vital sign monitors and/or attending to other details regarding the patient. The explanation of why neither Dr. Lemoine, who was present during the surgery only occasionally, nor Mr. Scott became aware that something was going terribly wrong during the surgical process is overwhelmingly established by the evidence—they simply failed to monitor the position of Ms. Boxie's head during surgery. Dr. Faul summed up the situation in his testimony when he stated that his study of the records in the case indicated to him that at the time the events were unfolding in Ms. Boxie's case, "nobody knew what was going on." In other words, although pressure was building in the patient's carotid arteries and Ms. Boxie was suffering massive strokes because of the decreased blood flow to the brain, noone in the operating theater knew it.

Dr. Lemoine testified that he knew the inherent dangers of the use of the sitting position, that he knew the attached monitors would provide no warning of mechanical obstruction of the carotid arteries, that he acknowledged the joint responsibility of the surgeon and the anesthesiologist in placement of a patient, and that he acknowledged the anesthesiologist's responsibility to make certain that a patient is properly oxygenated (including oxygenation of the brain) while under anesthesia. Still, neither he nor Mr. Scott performed a single visual inspection of the position of Ms. Boxie's head during the two and one-half hour procedure.

As pointed out by Dr. Wolff, a movement as slight as one reducing the spacing between the chin and sternum to a one-finger distance would have placed the flow

through the carotid arteries in jeopardy, and such a movement would not have been detectible absent an inspection of the patient's head under the drapes. We have reviewed the entire record, using the standards set forth in *Joseph*, 772 So.2d 94. Even resolving all reasonable inferences or factual questions in favor of the non-moving parties, on the basis of the evidence presented at trial, reasonable persons could only conclude that Ms. Boxie's head moved into an improper position during surgery; that this improper positioning caused a mechanical blockage of the carotid arteries during surgery, resulting in her stroke; and that Dr. Lemoine and his team shared with the surgeon, Dr. Foster, a responsibility to ensure that Ms. Boxie's head was properly positioned prior to surgery. Accordingly, we must affirm the trial court's grant of the JNOV.

### *Assignment of Error Number Two*

The defendants argue that the trial court erred in ordering that the motion for new trial would be granted if this court overruled its judgment granting the JNOV. Because we find that the trial court did not err in granting the JNOV, we need not consider this assignment of error.

### *Assignment of Error Number Three*

The defendants assert in their third assignment of error that the entire award of damages is excessive. However, on appeal they address only the excessiveness of the award of $700,000.00 in past medical expenses. Specifically, they assert that Ms. Boxie proved no more than $573,737.68 as past medical expenses. We review the trial court's award of damages pursuant to the JNOV using the manifest error standard of review. *Davis v. Wal-Mart Stores, Inc.*, 00-445 (La. 11/28/00), 774 So.2d 84.

At trial, Ms. Boxie introduced a medical billing summary totaling $749,366.08 as evidence of her past medical expenses. The defendants objected to the admission of the exhibit, contending that Ms. Boxie had not connected many of the charges to her medical expenses arising from Dr. Lemoine's malpractice. They make the same argument on appeal.

The amount in dispute, $134,685.79, is supported by certified copies of bills for medical services from various medical care facilities and pharmacies. None of the disputed statements are dated before her surgery giving rise to this litigation. Louisiana Revised Statute 13:3714(A) provides that when a certified copy of a bill for medical services is offered in evidence,

> it shall be received in evidence by such court as prima facie proof of its contents, provided that the party against whom the bills, medical narrative, chart, or record is sought to be used may summon and examine those making the original of the bills, medical narrative, chart, or record as witnesses under cross-examination.

Here, notations on the submitted medical bills establish that they were for treatment provided to Ms. Boxie, and most of them contain sufficient information to show that which of their services were related to Ms. Boxie's quadriplegia. For example, a bill from Lake Charles Memorial Hospital reflects that Ms. Boxie was admitted on October 20, 2003 and discharged on October 23, 2003, with total charges of $4,846.40 and final diagnoses that are described as "RECUR DEPR PSYCH-SEVER . . . QUADRIPLEGIA, UNSPECIF . . . OTH PERSIST MENTAL DIS . . . CONDUCT DISTURBANCE NO." The charges from Christus St. Patrick Hospital, dating from May 2, 2000 to April 5, 2006, total $38,791.86 and include charges for a September 23, 2004 barium test of Ms. Boxie's esophagus and February 24, 2004 diagnoses of her wrists, hips, and knees. The certified bills from Caraway's

17

Pharmacy total $7,829.55, and included bills for megestrol (used to treat sudden, unexplained weight loss), lexapro (used to treat severe depression), bisacodyl (a laxative), celexa (also used to treat depression), and furosemide (used to treat incontinence). The $75,426.00 in bills from Leading Health Care of La., Inc., by contrast, do not contain sufficient information on their faces to identify the services they provided to Ms. Boxie. But Ms. Boxie also introduced a notification from the State of Louisiana stating that Louisiana's Department of Health and Hospitals had paid the bills submitted to it by Leading Health Care of La., Inc., and that those bills were related to Ms. Boxie's injuries on May 8, 2000.

We conclude that there was sufficient evidence of medical expanses totaling at least $700,000.00 that were established to be for services provided to Ms. Boxie and related to the injuries that she received as a result of as a result of Dr. Lemoine's malpractice. Accordingly, we find that the trial court did not manifestly err in awarding Ms. Boxie $700,000.00 in past medical damages.

_____*Assignment of Error Number Four*

Finally, we find it unnecessary to address the defendants' argument that the trial court erred in giving a jury instruction regarding *res ipsa loquitur.* The jury returned a verdict in the defendant's favor. Therefore, any error concerning this instruction would be harmless. *Thomas v. Black & Decker (U.S.), Inc.*, 502 So.2d 157 (La.App. 3 Cir. 1987).

**DISPOSITION**

_____For the foregoing reasons, we reject the exception of no right of action, affirm the trial court's judgment notwithstanding the verdict, and affirm its awards of damages. We assess all costs of this appeal to the defendants.

**AFFIRMED**.